Christiana Kiefer (California Bar No. 277427)
        Designated counsel for service, LR 182(c)
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, D.C. 20001
T: (202) 393-8690
ckiefer@ADFlegal.org

Tyson C. Langhofer (Virginia Bar No. 95204)*
Mathew W. Hoffmann (DC Bar No. 1617417)*
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
T: (571) 707-4655
tlanghofer@ADFlegal.org
mhoffmann@ADFlegal.org

Alan Gura, (California Bar No. 178221)
INSTITUTE FOR FREE SPEECH
1150 Connecticut Avenue, N.W., Suite 801
Washington, DC 20036
T: (202) 967-0007
agura@ifs.org

*Admission pro hac vice pending

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MOMS FOR LIBERTY – YOLO COUNTY; INDEPENDENT COUNCIL ON WOMEN'S SPORTS; CALIFORNIA FAMILY COUNCIL; ELISABETH Y. BOURNE; ALLISON L. SNYDER; SOPHIA LOREY; KIM JONES; and CLARE ERIN FRIDAY, *Plaintiffs*, v. YOLO COUNTY; DIANA LOPEZ, in her official capacity as Yolo County Librarian; and D. SCOTT LOVE, in his official capacity as Library Regional Manager for the West Yolo County Library Region, *Defendants*. | **COMPLAINT** <br><br> Case No. _____ |

JURISDICTION

1.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as Plaintiffs allege that Defendants are violating 42 U.S.C. § 1983 by depriving them, under color of state law, of rights, privileges, and immunities secured by the First and Fourteenth Amendments to the United States Constitution.

VENUE

2.     This Court is the proper venue for this action per 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claim have occurred and are occurring in this judicial district.

INTRODUCTION

3.     "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

4.     Of all government officials, librarians—people entrusted with disseminating a broad range of perspectives and voices—should be expected to understand this much. But Yolo County librarians Defendants Scott Love and Diana Lopez believe that their job is to enforce conformity with the government's official views. They not only allow their ideological allies to disrupt speakers whose views they reject, they actively censor speech with which they disagree.

5.     Indeed, when Plaintiffs' ideological opponents disrupted their library event because they disagreed with Plaintiffs' viewpoint, Love stood ready to escalate the disruption to the level of official censorship—and did so. He declared that Plaintiffs' mere assertion that "men" should not be allowed to play on women's teams was unlawful speech, and expelled Plaintiffs from the space they had rented.

6.     Defendants are not required to agree with Plaintiffs' views about protecting women's sports. The First Amendment, however, requires that Defendants allow Plaintiffs to speak freely about the integrity of female athletics in library meeting rooms. It demands public library officials not enable—let alone participate—in the disruption and cancellation of Plaintiffs' events

on account of their viewpoints. The Court should hold Defendants accountable for the damage they caused in censoring Plaintiffs' event and ensure that such censorship never happens again.

THE PARTIES

7.      Plaintiff Moms for Liberty – Yolo County ("Yolo M4L") is the Yolo County, California Chapter of Moms for Liberty, a 501(c)(4) organization whose mission is to organize, educate and empower parents to defend their parental rights at all levels of government.

8.      Plaintiff Elisabeth (Beth) Y. Bourne resides in Yolo County, California, and is the Chair of Plaintiff Moms for Liberty – Yolo County.

9.      Plaintiff Allison (Allie) L. Snyder is a mother whose child attends a Yolo County public school.

10.      Plaintiff Sophia Lorey is Outreach Director at Plaintiff California Family Council.

11.      Plaintiff California Family Council is an organization that seeks to advance God's design for life, family, and liberty through California's Church, Capitol, and Culture.

12.      Plaintiff Independent Council on Women's Sports ("ICONS") is a non-partisan, non-profit organization comprised of current and former collegiate and professional women athletes, their families, and their supporters. ICONS engages in public and legal advocacy on the importance of protecting the integrity of female athletics.

13.      Plaintiff Kim Jones is a co-founder of Plaintiff ICONS.

14.      Plaintiff Clare (Erin) Friday serves as a regional lead for Our Duty, an international support network for parents who wish to protect their children from the harms of identifying with a gender identity inconsistent with their sex.

15.      Defendant Yolo County is a corporate body and legal subdivision of the State of California. Defendant Yolo County established the Yolo County Library pursuant to California law. *See* Yolo Cnty., Cal. Ordinances § 2-5.401 (Res. of Oct. 4, 1915); Cal. Educ. Code § 19100. Defendant Yolo County's Board of Supervisors appoints Defendant County Librarian. Cal. Educ. Code § 19140. Under California law, Defendant Yolo County sets general rules and policy for the operation of the County Library. Cal. Educ. Code § 19146.

16.     Defendant Diana Lopez is, and at all relevant times has been, Yolo County's official Librarian. In that role, Lopez "shall, subject to the general rules adopted by the board of supervisors, build up and manage, according to accepted principles of library management, a library for the use of the people of the county." Cal. Educ. Code § 19146. Defendant Yolo County has delegated Lopez the authority to enact, amend, and enforce policies governing libraries in the County, including the *Policy* and *Code* challenged herein, as well as the authority to hire, terminate, and supervise library employees. She is sued in her official capacity.

17.     Defendant D. Scott Love is, and at all relevant times has been, the Library Regional Manager for the West Yolo County Library Region, which includes the Mary L. Stephens – Davis Branch Library. As Library Regional Manager, Defendant Love has the authority and duty to enforce policies adopted by Defendant Yolo County and Defendant County Librarian Lopez, including the *Policy* and *Code* challenged herein, at the libraries under his jurisdiction, including Mary L. Stephens. He is sued in his official capacity.

STATEMENT OF FACTS

*Defendants'* Policy *and* Code

18.     Defendants maintain a *Library Meeting Room Policy* (the "*Policy*") governing the use of library facilities by not-for-profit groups. A true and correct copy of the *Library Meeting Room Policy* is attached hereto as Exhibit A.

19.     The *Policy* provides that library facilities should be made "available on an equitable basis, regardless of the beliefs or affiliations of individuals or groups requesting their use," Ex. A at 1 (quoting Library Bill of Rights, Article Six), and provides that "viewpoint neutral political forums may be allowed." *Id.* at 2. However, the *Policy* also requires that "[m]eeting rooms must be used in a way so that any use advances the Yolo County Library's mission to *provide access for all to ideas that inform, entertain, and inspire*, and to 'connect people and ideas.'" *Id.*

20.     The *Policy* prohibits "any group whose program would interfere in any way with library services" from reserving meeting rooms. *Id.* at 3.

21.     Defendant Lopez interprets the *Policy* to prohibit groups from bringing private security to events in reserved rooms because that security would "interfere" with "library services."

22.     Failing to comply with the *Policy*'s terms "<u>will result in withdrawal of room reservation privileges.</u>" *Id.* at 2.

23.     Defendants also maintain a *Library Code of Behavior* (the "*Code*"), which requires all people on library property to "[t]reat people, materials and furniture with respect." Ex. B at 1. A true and correct copy of the *Library Code of Behavior* is attached hereto as Exhibit B.

24.     The *Code* warns that "intentionally interfer[ing] with the business of the library by obstructing or intimidating those attempting to carry on business in the library and . . . refus[ing] to leave the library after being requested to do so by the library management" is a "misdemeanor." *Id.* (citing Cal. Penal Code § 602.1).

25.     The *Code* further provides that "[a]ll other laws pertaining to behavior in a public place apply, including California Penal Code Sections 314, 415, 647 and 653b." *Id.* California Penal Code § 415, "Disturbing the Peace," imposes fine and imprisonment upon "(2) Any person who maliciously and willfully disturbs another person by loud and unreasonable noise."

26.     Defendant Lopez interprets the *Code* to prohibit disrupting scheduled events in reserved rooms.

*Defendants' Discrimination Against Plaintiffs' Viewpoints*

27.     The individual Plaintiffs generally believe that sex is binary, biologically determined, and immutable. Moreover, they believe that men's physiology generally enables them to outperform women athletically. Accordingly, they believe that the participation of boys and men in female sports is dangerous and unfair, and that girls and women are harmed by the ideologies that reject their beliefs regarding sex. The individual Plaintiffs wish to express their views on these subjects in order to persuade others, and ultimately influence public policy.

28.     Plaintiff Jones founded ICONS to advance these views on sex and participation in athletics. Many Yolo M4L members agree, and Yolo M4L believes that a frank and open debate about these subjects is essential. Plaintiffs believe that parents' right to direct the upbringing of

their children includes the right to counsel and direct their children with respect to matters of sex and gender according to their own values and understanding of the world.

29.     Accordingly, Plaintiffs wish to foster and participate in the public debate concerning sex, gender identity, and participation in athletics. To that end, Yolo M4L has reserved Yolo County public library meeting rooms for use by the Plaintiffs to advance debate and discussion of their views.

30.     Defendants have used their governmental authority to frustrate and block Plaintiffs' expression on these subjects by refusing to enforce their rules against the disruption of Plaintiffs' events, and even shouting down and terminating Plaintiffs' speech with which they disagree.

<u>February 25 – the "Brave Books Family Hour"</u>

31.     Yolo M4L and Bourne reserved the Blanchard Room at Yolo County's Mary L. Stevens – Davis Branch Library to present a "Brave Books Family Hour" on February 25, 2023. The event aimed to foster discussion of children's books published by Brave Books, which celebrate families and honor traditional values.

32.     On February 6, 2023, prior to the Brave Books event, Defendant Lopez emailed Defendant Love and Crista Cannariato, Yolo County Regional Supervisor, West Yolo Region about Plaintiffs Yolo M4L and Bourne's request to use the Blanchard Room for the February 25 event, offering that she "was relieved" that some parents had accused Bourne of "transphobia," and instructing Cannariato that she "should go ahead and proceed as we discussed." Ex. C at 1. A true and correct copy of that email is attached hereto as Exhibit C.

33.     The same day, Cannariato emailed Davis City Councilmember Gloria Partida. Partida is founder of the Davis Phoenix Coalition, a group that had previously supported a drag queen story hour at the library and whose views on sex and gender are antithetical to those of Plaintiffs. Cannariato wrote about the "difficult issue the Library [was] facing" from Yolo M4L and Bourne's request to use the Blanchard room for the February 25 event. Cannariato labeled Bourne as a "vocal anti-trans member of the community," and expressed concerns that Bourne

would "attempt to promote" her "anti-trans" "agenda" at the event. Ex. D at 4. A true and correct copy of that email thread is attached hereto as Exhibit D.

34.     Ms. Cannariato asked Ms. Partida if the Phoenix Coalition would "be interested" in "partner[ing]" with the library to "host" a "queer-affirming event[ ]." *Id.*

35.     Partida responded two hours later, copying Davis Phoenix Coalition's Rainbow Families Director Anoosh Jorjorian. *Id.* at 3. Partida thanked Cannariato for "bringing" the "deeply disturbing" event to her attention and asked whether the library had "specific rules against holding events that violate creating safe spaces for all?" *Id.* Cannariato replied that, "[u]nfortunately," the library did "not feel confident" that it "could legally defend refusing the reservation under [its] current meeting room use policy." *Id.* at 2. But she asserted that the library would "be looking at how" it could "strengthen" its *Policy* and *Code* "in the future to better protect the community against potential hate speech." *Id.*

36.     Ms. Cannariato wrote that she "would love to do another Drag Queen story hour" and also "would love to have some queer positive programming scheduled for around the time of" the February 25 event. *Id.* at 2–3.

37.     On February 9, 2023, Defendant Love emailed the City of Davis Police Department, its chief, Darren Pytel, and a City of Davis official to express "concerns with" Moms for Liberty "using the room." Defendant Love warned them that "Brave Books" had advertised the event, "which may draw more like-minded individuals to the program." Defendant Love wrote that Bourne tried "to get an anti-trans book added" to school libraries and "complain[ed] about a trans documentary" shown at Davis Senior High School. Ex. E at 2–3. A true and correct copy of Defendant Love's email correspondence is attached hereto as Exhibit E.

38.     On February 18, 2023, Defendant Love emailed Yolo County Sheriff Tom Lopez concerns about the event and informed him that the library was not "involved in" the event because it contravened the library's "diversity, equity and inclusion values." Ex. F at 1. A true and correct copy of that email is attached hereto as Exhibit F.

39.     On February 22, 2023, Defendant Love wrote a community member that the proposed Brave Books event had "been quite the awakening to" the library and that library

officials were "none too happy about" it. A true and correct copy of that email is attached hereto as Exhibit G.

40.     The day before the Brave Books event, Defendant Lopez emailed library staff and informed them that Moms for Liberty is "anti-LGBTQIA, anti-woke, [and] anti-critical race theory." Lopez told staff that the library would display "LGBTQIA-affirming materials," including books, "LGBTQIA+ resources bookmark[s]," an "LGBTQIA+ bibliography," and "LGBTQIA+ flag buttons" in the library during the event. Ex. H at 1, 3. Defendant Lopez also asked staff to "report" "hate speech" to supervisors "immediately," defining "hate speech" as "offensive discriminatory language that attacks or uses discriminatory language with reference to a person or a group on the basis of who they are, in other words, based on their religion, ethnicity, nationality, race, color, descent, sexual orientation, gender or other identity." Ex. H at 4. A true and correct copy of that email is attached hereto as Exhibit H.

41.     The February 25 event hosted approximately 25 people, including three protestors who stood in the back of the room, and finished successfully with no disruption.

<u>March 17 – *Affirmation Generation* film screening</u>

42.     On March 17, 2023, Yolo M4L hosted a screening of the film *Affirmation Generation* and a discussion with its executive producer, Joey Brite, a Northern California lesbian-feminist leader, in the Blanchard Community Room at the Mary L. Stevens – Davis Branch Library. Approximately twenty people attended the event.

43.     *Affirmation Generation* exposes the consequences of so-called "gender affirming care" and features stories of detransitioners who medically transitioned to live as the opposite sex but have now reverted to living consistent with their natal sex, having suffered numerous lifelong medical complications due to their transition.

44.     During the event, Anoosh Jorjorian stood in the front of the room, next to the screen and held up signs protesting the film. Jorjorian's signs included the messages "Transphobia = hate," "Trans is Natural," and "Fact-Free Fear-Mongering Propaganda." Jorjorian wrote new signs, rolled her eyes, and laughed dismissively for approximately 60 minutes of the nearly 90-minute film.

45.     Snyder and Brite asked Jorjorian to take her protest either to the back of the room or outside, but Jorjorian refused to move.

46.     Moreover, during the screening, protestors on the sidewalk on library property immediately outside the room deliberately made disruptive noise, causing attendees to have difficulty hearing the film.

47.     After the event, Snyder emailed Defendants Lopez and Love about Jorjorian's disruption. Lopez apologized for the "disrupt[ion]," and wrote that she "spoke[ ] with Anoosh Jorjorian about the importance of not disturbing scheduled events of other groups." Lopez conceded that Defendants' *Code* prohibited "disrupt[ing] others" in reserved rooms, but did not reference any other consequence for Jorjorian's disruption of the event. Ex. I at 1. A true and correct copy of the email chain between Snyder, Lopez and Love regarding this event is attached hereto as Exhibit I.

48.     Upon information and belief, Jorjorian has not suffered any consequence for violating Defendants' *Code*.

April 22 – Lecture on
"The Biology of Sex & Gender Curricula in California Public Schools"

49.      On April 22, 2023, Yolo M4L sponsored a lecture in the Blanchard Community Room at the Mary L. Stevens – Davis Branch Library by Colin Wright titled "The Biology of Sex & Gender Curricula in CA Public Schools."

50.     Before the event, Bourne asked the Davis Police Department for police assistance because of Jorjorian's past disruption and the library's refusal to address the disruption. A Davis Police Department lieutenant responded that he could alert officers to "[b]e aware of the incident/event" but he could not "guarantee anything." The lieutenant "agree[d] with" Bourne that "the appropriate course of action [would be] to hire a private security company for [the] event." Ex. J. at 4. A true and correct copy of the summary of Bourne's correspondence with the Davis Police Department regarding police presence at library events is attached hereto as part of Exhibit J.

51.    Because of the lack of guaranteed police presence, Bourne hired two private security guards for the April 22 event, which proceeded without disruption before approximately 50 attendees, despite the presence of approximately 24 protestors outside the meeting room.

52.    Although the event did not interfere with the provision of any library services, Defendants Lopez and Love emailed Bourne to declare that the presence of private security guards violated the *Policy* because "[e]vents or programs that require the presence of security in the library is [sic] clearly a disruption to library services" and thus "interfere" with "library services." Ex. J at 2. Although Defendants prohibited Plaintiffs from bringing private security guards to future events, they did not guarantee Bourne that the library would take any action to enforce its policies against future disruption of Yolo M4L events. A true and correct copy of Bourne's correspondence with Lopez and Love regarding library event security is attached hereto as Exhibit J.

<u>May 21 – "Book Curation for Child Safeguarding"</u>

53.    On May 21, 2023, Yolo M4L hosted an event in the Blanchard Community Room at the Mary L. Stevens – Davis Branch Library titled, "Book Curation for Child Safeguarding," which explored whether books currently available in local schools and libraries are inappropriate for children.

54.    Approximately 25 people attended the event. Among these, approximately 15 protestors spoke out of turn during the discussion, disrupting the event and preventing Yolo M4L from conducting it as planned.

55.    Defendants did not remove any protestors or stop them from disrupting the event, nor did Defendants take any action against those who disrupted the event. Defendants did not discipline any of the protestors for their violation of Defendants' *Code*.

<u>August 20 – "Forum on Fair and Safe Sport for Girls"</u>

56.    Plaintiffs Yolo M4L and Bourne reserved the Blanchard Community Room for an August 20 event titled "Forum on Fair and Safe Sport for Girls." A true and correct copy of a flyer and agenda for the Forum is attached hereto as Exhibit K.

57.     The Forum aimed to "[e]mpower and protect girls' sports and female athletes," "[d]efend the original intent of Title IX," and "[c]reate a powerful network of coaches, parents, and girls' sports supporters." Ex. K at 3.

58.     Plaintiffs Lorey, Friday, Jones, Snyder, and Bourne all planned to speak at the forum. Lorey intended to discuss her experience playing on her high school and college's female soccer teams. Friday planned to discuss California state policies and California Interscholastic Federation (CIF) policies regarding participating in sports based on asserted gender identity and the impact on girls' sports in California. Jones, on behalf of ICONS, intended to discuss the history and current status of Title IX and its protection for female sports. And Snyder and Bourne planned to discuss the damage to girls' sports caused by CIF's "Gender Diverse Inclusivity Toolkit," which allows youth to compete in sports based on asserted gender identity.

59.     Approximately fifteen minutes prior to the forum's start, Defendant Love approached Bourne, Snyder, and Jones, in an interaction videoed by Snyder with the consent of all participants.

60.     Defendant Love told Bourne, Snyder, and Jones that California law and Defendants' *Code* prohibited "misgendering," and that "California state law recognizes transgender" as "protected." Love instructed that if Plaintiffs "speak[ ] about a transgender female, they need to be referred to as a female; transgender male needs to be referred to as a male."

61.     Defendant Love warned Plaintiffs that "if there is any misgendering" he would ask that person to "leave" with "no exceptions." According to Love, that was "it" and his "direction."

62.     Bourne asked Love if Plaintiffs could say, before talking about a transgender-identifying person, that "this was my belief and this is what I see?" But Love prohibited that speech. He declared that Plaintiffs' proposal would violate Defendants' *Code* by not treating others with "respect" because it would "call[ ]" that person "a gender they are not."

63.     The forum attracted 65 attendees, including approximately 25 protestors and Defendant Love. Love encouraged protestors outside the library to enter the Blanchard Room,

and told an attendee that he hoped more people would enter the room so that it would exceed its capacity and require the fire marshal to terminate Plaintiffs' forum.

64.     Lorey opened the forum, but within two minutes, as soon as she mentioned "men" playing on women's sports teams, a protester in the audience shouted her down for "misgendering," and demanded to know whether Lorey planned to "misgender" throughout her presentation. As on cue, Defendant Love then warned the speakers that if "transgender females" were called "males," the person saying so would violate the library's *Code* and would be asked "to leave immediately." Love told Plaintiffs, "California state law recognizes trans women as women." He added that Defendants' *Code* "talks about treating people with respect and if [Plaintiffs] are misgendering somebody, that is not respectful."

65.     Lorey continued with her talk for approximately one more minute, during which she discussed her dream to be a college soccer player and her success in achieving that dream. But when Lorey asserted that "current 10-year-old girls cannot live out [the] same dream as long as men are allowed to compete in women's sports," protestors interrupted to shout that she could not refer to "men" competing in women's sports.

66.     Defendant Love warned that she was "misgendering," and threatened to eject her if she "misgendered" again.

67.     Lorey continued with her talk, stating that "no matter how hard biological girls work, they will . . . never be able to be physiologically faster and stronger than biological men that are trying to play in biological female sports. Allowing biological men in women's sports does not create an equal playing field, but instead robs young girls of their athletic aspirations." But as Lorey spoke, protestors laughed and talked over her.

68.     Defendant Love then asked Lorey to leave the Blanchard Room because she was "misgendering," and declared that he would "shut the entire program down" if she did not leave.

69.     At this point, Friday rose to speak about the importance of free speech for all, only to be interrupted and heckled by protestors. And rather than address the disruption of Friday's speech, Love reiterated his command that Lorey leave because of her "misgendering" and again declared that if she did not leave, he would "shut down" the program.

70.     Lorey moved from the podium and stood quietly on the side of the room at Defendant Love's command. But Defendant Love then started walking out of the room and said, "The program is over." Love informed Plaintiffs that if they did "not leave," it would "affect" Yolo M4L's "standing" to use the room for future events.

71.     Friday then began her talk, but Love soon reentered the room. After Friday said, "How did we get to where boys can compete in girls' sports and take their scholarships, trophies, and podium spots," Love instructed "everyone" to "leave." Friday had spoken for approximately three minutes.

72.     Defendant Love then turned off the projector to prevent the program from continuing, and Plaintiffs left the library. No Plaintiff completed her planned remarks.

73.     Bourne, Snyder, Lorey, and Friday all incurred travel expenses to attend the forum Defendant Love shut down.

74.     Bourne incurred advertising, recording, livestreaming, and food and beverage expenses for the forum Defendant Love shut down.

*The Continuing Impact of Defendants' Discriminatory Policies and Practices*

75.     Plaintiffs desire to host the entire forum in the Blanchard Room, deliver their prepared remarks, and promote their views on women's sports, as originally planned. To this end, Yolo M4L has reserved the Blanchard Room for March 3, 2024.

76.     Plaintiffs Yolo M4L, Bourne, and Snyder also intend to continue reserving meeting rooms at Yolo County public libraries to disseminate their views on sex, gender, and other controversial topics—views that are (for now) unpopular in Yolo County and which are unlikely to be aligned with Defendants' political preferences.

77.     But when Plaintiffs sought Defendants' assurances that they would cease discriminating against their viewpoints and take steps to enable their events at the public library, Defendants refused, and instead, all but confirmed that they would remain committed to censoring Plaintiffs' speech.

78.     On September 6, 2023, counsel for Plaintiffs wrote to Defendant Lopez, requesting that she "confirm in writing that":

a.   Plaintiffs and audience members could "express their understanding of sex and gender during the event, even if library officials consider this to be 'misgendering' or otherwise wrong or offensive";

b.   Library officials would "not shut down the event or try to censor anyone that refers to a person whose natal sex is male as male, man, boy, he, or him, or that refers to a person whose natal sex is female as female, woman, girl, she, or her";

c.   Library officials would "not take any adverse action against [Plaintiffs] or members of the audience based on their viewpoint related to gender identity or the sex or gender of participants in sports";

d.   Library officials would "provide adequate security" and "promptly remove any attendee(s) that attempts to disrupt the event in any way, including but not limited to, shouting down or interrupting the speakers, making sounds that interfere with the speakers' ability to be heard, blocking entrances or exits, or obstructing views"; and

e.   Plaintiffs could "hire private security" if they desired.

Ex. L at 1–2. A true and correct copy of Plaintiffs' counsel's email is attached hereto as Exhibit L.

79.   On September 13, 2023, counsel for Defendant Lopez responded. A true and correct copy of that letter is attached hereto as Exhibit M.

80.   Counsel for Defendant Lopez "recognize[d]" Defendants' "legal obligation" to comply with "the First Amendment . . . with the understanding that the Library's public meeting rooms are a designated public forum." But rather than agree that Plaintiffs could express their views about sex and gender, Lopez's Counsel suggested that Defendants are not obliged to permit "'fighting words' or other categories of speech that federal courts have previously held [to be] unworthy of First Amendment protection."

81.   Moreover, Lopez's Counsel refused to "extend a vague assurance that those who 'disrupt the event in any way' will be removed." Instead, he sought "additional discussion" about "mutual expectations" regarding "the scope of the County's legal responsibility and on matters

such as the role of security, staffing, costs, as well as other measures, such as ticketing, that may promote a safe and effective event." But no discussion was welcomed about Plaintiffs' provision of their own security: "[i]n no circumstance" would Defendants "permit a private security presence." Ex. M at 1.

82.     In other words, rather than assure that the library rules prohibiting disruption would be enforced to secure Plaintiffs' events, Defendants suggested Plaintiffs' speech is unprotected, and took the position that Plaintiffs would have to pay the County ("mutual expectations" about "costs") for security or restrict access to their event ("ticketing"), assuming that their speech would be allowed in the first place.

83.     Counsel for Defendant Lopez did not confirm that Defendants would honor any of Plaintiffs' five requests.

84.     Considering (1) Defendants' hostility to Plaintiffs, and their record of (2) inviting people to disrupt Yolo M4L's events, (3) failing to enforce basic rules against those who disrupt Yolo M4L events, (4) rigid enforcement of their policies to silence Plaintiffs' speech, (5) contacting law enforcement to denounce Plaintiffs and their audience, (6) Defendant Love's expressed hope that Plaintiffs' event would be shut down by the fire marshal, and (7) Lopez counsel's suggestion that Plaintiffs' speech is unprotected and that Plaintiffs must pay for security to present their events, Plaintiffs refrain from holding their March 3 forum or other events at Yolo County public library meeting rooms for fear that if they go forward with the forum or other events, protestors allied with and enabled by Defendants will again shout down Plaintiffs' forum and other events; and that Defendants will again censor Plaintiffs, terminate Plaintiffs' forum or other events for "misgendering" and other perceived offenses under their practices and policies, and expel Plaintiffs, including by subjecting them to arrest and prosecution under Cal. Penal Code 602.1 as set forth by their *Code*.

COUNT ONE
FIRST AMENDMENT RIGHT OF FREE SPEECH, 42 U.S.C. § 1983
CONTENT AND VIEWPOINT DISCRIMINATION
FACIAL CHALLENGE TO LIBRARY CODE AND POLICIES

85.     Plaintiffs reallege all matters set forth in paragraphs 1–84 and incorporate them herein.

86.     The First Amendment protects the speech that Plaintiffs have expressed, attempted to express, and intend to continue expressing at their events in Yolo County public library meeting rooms.

87.     As Defendants acknowledged, the meeting rooms at the Yolo County public libraries are designated public fora for First Amendment purposes. Accordingly, content-based restrictions in the Yolo County public libraries are presumptively unconstitutional and subject to strict scrutiny, and viewpoint-based restrictions in these fora are prohibited.

88.     The rule within Defendants' meeting room policy providing that "[m]eeting rooms must be used in a way so that any use advances the Yolo County Library's mission to *provide access for all to ideas that inform, entertain, and inspire*," violates the First Amendment right of free speech on its face by discriminating against speech on the basis of content and viewpoint.

89.     The requirement of Defendants' *Library Code of Behavior* demanding that "people" must be treated with "respect" violates the First Amendment right of free speech on its face by discriminating against speech on the basis of content and viewpoint.

90.     Defendants maintain a custom, policy, and practice that prohibits speakers from referring to people in accord with their natal sex ("misgendering"), and from criticizing or questioning any tenet of ideologies that claim that sex is not binary and immutable. This custom, policy, and practice violates the First Amendment right of free speech by discriminating against speech on the basis of viewpoint.

91.     Defendants maintain a custom, policy, and practice of enabling the disruption of speakers who refer to people in accord with their natal sex ("misgendering"), and who criticize or question any tenet of ideologies that claim that sex is not binary and immutable. Defendants implement this policy by inviting and directing protestors to meeting rooms with the expectation

that the protestors would disrupt the disapproved speech, and by refusing to enforce their *Code* or other policies governing the disruption of library events which are expected to contain the disapproved speech. This custom, policy, and practice violates the First Amendment right of free speech by discriminating against speech on the basis of viewpoint.

92.     By enforcing these provisions and customs, practices, and policies, Defendants, under color of law, deprive Plaintiffs of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory, and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional provisions, customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT TWO
FIRST AMENDMENT RIGHT OF FREE SPEECH, 42 U.S.C. § 1983
CONTENT AND VIEWPOINT DISCRIMINATION
AS-APPLIED CHALLENGE TO LIBRARY CODE AND POLICIES

93.     Plaintiffs reallege all matters set forth in paragraphs 1–84 and incorporate them herein.

94.     As applied against Plaintiffs, the requirement of Defendants' *Library Code of Behavior* demanding that "people" must be treated with "respect" violated and continues to violate the First Amendment right of free speech by discriminating against speech on the basis of content and viewpoint.

95.     In defining any speech that would require security as an interference with library services, Defendants authorize an unconstitutional heckler's veto and adopt it as their own content- and viewpoint- based action. Thus, as applied against Plaintiffs, the provision of Defendants' *Policy* that prohibits speech that "interfere[s] in any way with library services" also discriminates based on content and viewpoint.

96.     By enforcing these provisions and customs, practices, and policies, Defendants, under color of law, deprive Plaintiffs of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in

violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory, and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants' unconstitutional provisions, customs, policies, and practices; and attorney fees and expenses pursuant to 42 U.S.C. § 1988.

COUNT THREE
FIRST AMENDMENT RIGHT OF FREE SPEECH, 42 U.S.C. § 1983
OVERBREADTH

97.     Plaintiffs reallege all matters set forth in paragraphs 1–84 and incorporate them herein.

98.     A rule is overbroad, in violation of the First Amendment, if "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quoting *Wash. St. Grange v. Wash. St. Republican Party*, 552 U.S. 442, 449 n.6 (2008)).

99.     The rule within Defendants' meeting room policy providing that "[m]eeting rooms must be used in a way so that any use advances the Yolo County Library's mission to *provide access for all to ideas that inform, entertain, and inspire*," is facially overbroad, in violation of the First Amendment right of free speech, as it purports to forbid a vast array of protected speech—all speech that Defendants may not find informative, entertaining, or inspiring.

100.    The requirement of Defendants' *Library Code of Behavior* demanding that "people" must be treated with "respect," is facially overbroad, in violation of the First Amendment right of free speech, as it purports to prohibit all communication that is not "respectful" of other people.

101.    By enforcing these provisions and customs, practices, and policies, Defendants, under color of law, deprive Plaintiffs of the right to free speech in violation of the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory, and preliminary and permanent injunctive relief against continued enforcement and maintenance of Defendants'

1   unconstitutional provisions, customs, policies, and practices; and attorney fees and expenses

2   pursuant to 42 U.S.C. § 1988.

3
                                            COUNT FOUR
    FIRST AND FOURTEENTH AMENDMENT RIGHTS OF FREE SPEECH, DUE PROCESS, 42 U.S.C. § 1983
4                                            VAGUENESS

5       102.    Plaintiffs reallege all matters set forth in paragraphs 1–84 and incorporate them

6   herein.

7       103.    As notice is the first element of due process, the Fourteenth Amendment guarantee

8   of Due Process prohibits the enforcement of vague laws. The First Amendment likewise forbids

9   the enforcement of laws that, however valid their application may be in some instances, are so

10  vague as to chill protected speech.

11      104.    The rule within Defendants' *Policy* providing that "[m]eeting rooms must be used

12  in a way so that any use advances the Yolo County Library's mission to *provide access for all to*

13  *ideas that inform, entertain, and inspire*," is unduly vague, as is the requirement of Defendants'

14  *Library Code of Behavior* demanding that "people" must be treated with "respect."

15      105.    Defendants do not define what it means to "[t]reat" others with "respect."

16      106.    These provisions do not afford a person of ordinary intelligence fair notice of what

17  is prohibited and are so standardless that they authorize discriminatory enforcement.

18      107.    The lack of definitions, the inherent subjectivity of those terms, and the breadth of

19  those terms render Defendants' *Policy* and *Code* incapable of providing meaningful guidance on

20  what they prohibit to Defendants or Plaintiffs.

21      108.    Accordingly, these provisions, on their face and as applied against Plaintiffs,

22  violate their rights to free speech and due process.

23      109.    By enforcing these provisions and customs, practices, and policies, Defendants,

24  under color of law, deprive Plaintiffs of the right to free speech in violation of the First and

25  Fourteenth Amendments to the United States Constitution. Plaintiffs are thus damaged in

26  violation of 42 U.S.C. § 1983, and are therefore entitled to damages; declaratory, and preliminary

27  and permanent injunctive relief against continued enforcement and maintenance of Defendants'

28

1  unconstitutional provisions, customs, policies, and practices; and attorney fees and expenses
2  pursuant to 42 U.S.C. § 1988.

3                                    PRAYER FOR RELIEF

4      Wherefore, Plaintiffs respectfully request that judgment be entered in their favor and
5  against Defendants as follows:

6      1.  Orders preliminarily and permanently enjoining Defendants, their officers, agents,
7          servants, employees, and all persons in active concert or participation with them who
8          receive actual notice of the injunction, from enforcing, generally and against Plaintiffs:

9              a.  The Yolo County public library meeting policy rule that restricts room access to
10                 "ideas that inform, entertain, and inspire;"

11             b.  The Yolo County public library *Code of Behavior*'s requirement that people
12                 be "treat[ed]" with "respect;"

13             c.  The Yolo County public library *Policy*'s provision that prohibits "interfer[ing]
14                 in any way with library services" on the basis that speech would require
15                 security;

16             d.  Defendants' custom, policy, and practice that prohibits speakers from referring
17                 to people in accord with their natal sex ("misgendering"), and from criticizing
18                 or questioning any tenet of ideologies that claim that sex is not binary and
19                 immutable;

20             e.  Defendants' custom, policy, and practice of enabling the disruption of speakers
21                 who refer to people in accord with their natal sex ("misgendering"), and who
22                 criticize or question any tenet of ideologies that claim that sex is not binary and
23                 immutable, including by inviting and directing protestors to meeting rooms
24                 with the expectation that the protestors would disrupt the disapproved speech,
25                 and by refusing to enforce their *Code* or other policies governing the disruption
26                 of library events which are expected to contain the disapproved speech;

27

28

1        2.   Declaratory relief consistent with the injunction, to the effect that Plaintiffs enjoy

2            a First Amendment right to refer to people as being of their natal sex, and to assert,

3            criticize or question any ideology or belief with respect to sex or gender;

4        3.   Compensatory damages to make Plaintiffs whole for their expenses incurred in

5            organizing and hosting the August 20 forum, and suffered as a consequence of

6            Defendants' unlawful censorship and disruption of that event;

7        4.   Nominal damages for the violation of Plaintiffs' constitutional rights;

8        5.   Costs of suit;

9        6.   Attorneys' fees and expenses pursuant to 42 U.S.C. § 1988; and

10       7.   Any other relief as the Court deems just and appropriate.

11      Dated: December 4, 2023            Respectfully submitted,

12

13       _/s/ Christiana Kiefer_

Alan Gura (California Bar No. 178221)    Christiana Kiefer (California Bar No. 277427)

14 INSTITUTE FOR FREE SPEECH         ALLIANCE DEFENDING FREEDOM

1150 Connecticut Ave., N.W.,          440 First Street NW, Suite 600

15 Suite 801                       Washington, D.C. 20001

Washington, DC 20036            T: (202) 393-8690

16 T: (202)967-0007               ckiefer@ADFlegal.org

agura@ifs.org

17                             Tyson C. Langhofer (Virginia Bar No. 95204)*

18                             Mathew W. Hoffmann (DC Bar No. 1617417)*

ALLIANCE DEFENDING FREEDOM

19                             44180 Riverside Parkway

Lansdowne, VA 20176

20                             T: (571) 707-4655

21                             tlanghofer@ADFlegal.org

mhoffmann@ADFlegal.org

22                             *Admission pro hac vice pending

23                             _Attorneys for Plaintiffs_

24

25

26

27

28